FILED
CLERK, U.S. DISTRICT COURT

SEP - 9 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GILBERT SALDANA, et al.,<br><br>Defendants. | No. 06-50678<br><br>D.C. No. CR 04-415(B) PA<br><br>COURT'S FINDINGS OF FACT IN SUPPORT OF THE DENIAL OF DEFENDANT GILBERT SALDANA'S MOTION TO SUPPRESS |

Defendant Gilbert Saldana, a member of the Avenues street gang, was convicted by a jury of various crimes, including conspiracy to murder Kenneth Curry Wilson, an Afro-American man who was shot and killed in the Highland Park neighborhood of Los Angeles claimed by the gang. Prior to trial, Saldana moved to suppress a statement he made to Los Angeles Police Department detectives. Saldana contended in his pre-trial motion to suppress that his statement resulted from a custodial interrogation and that he had not been read his <u>Miranda</u> rights. The government argued that the statement was voluntary and that the questioning was not intended to elicit incriminating statements and therefore was not the product of a custodial interrogation.

After hearing testimony and argument over three days and during trial, this Court denied the motion and allowed the government to admit into evidence Saldana's statement.

The Ninth Circuit Court of Appeals remanded this action for factual findings in support of this Court's denial of Saldana's motion. The Court submits its factual findings as follows:

1. On February 21, 1999, Rene Cerda was murdered in an area of Los Angeles patrolled by the Los Angeles Police Department's Hollenbeck Division. Cerda's murder was ultimately proven to have been committed by Saul Audelo, a member of the White Fence street gang. Defendant Gilbert "Lucky" Saldana was never a suspect in the Cerda murder.

2. Kenneth Curry Wilson was murdered on April 18, 1999, as he attempted to park a car on a public street in Highland Park. Wilson's murder was investigated by officers in the Los Angeles Police Department's Northeast Division.

3. Two years after Wilson's murder, a ballistics examination revealed that one of the guns fired at him in 1999 was a 9mm that had also been used in the unrelated Cerda murder. Northeast Division detectives through their investigation into Wilson's murder learned that Audelo had sold a 9mm handgun to Saldana. Specifically, Audelo admitted that he had sold a 9mm firearm to Saldana, a member of a rival street gang – the Avenues.

4. Hollenbeck detectives, including Detectives Gabriel Rivas and William Eagleson, who were investigating the Cerda murder, obtained a search warrant and on May 6, 1999, searched Saldana's home. At that time, Saldana lived with his mother on Ulysses Street in Los Angeles. Detectives entered Saldana's home in the early morning hours. During the execution of the search warrant, Saldana was seated on the couch in the living room with his mother, sister, and brother while the detectives searched the home. He was not handcuffed. Detectives, who were searching for the gun used in the Cerda murder, did not find the weapon. Indeed, no firearm was found during the search.

5. At the time of the search, Hollenbeck detectives were not familiar with Saldana, did not consider him a suspect and did not have any warrants for his arrest. They explained to Saldana that they wanted to speak with him as a witness in order to find the gun that had been used to kill Cerda.

6. Detective Rivas told Saldana that he was not under arrest, was not a suspect in the investigation of Cerda's murder and that they were looking for a 9mm Ruger handgun. Detective Rivas asked Saldana if he was willing to cooperate in order to obtain the missing weapon and whether he would accompany him to the Hollenbeck station to answer questions. Saldana agreed. He was given a choice of driving his own car or riding with Detective Rivas. He chose to go with Detective Rivas. Detective Rivas wanted to establish a relationship with him in order to obtain his cooperation.

7. Saldana accompanied Detective Rivas to the Hollenbeck Division police station where he voluntarily provided a statement. He was not handcuffed and again was advised that he was not under arrest and was free to leave. During the interview both the detectives and Saldana spoke in a non-confrontational conversational tone. There was no yelling and no raised voices. The detectives informed Saldana at least twice that he was not under arrest.

8. The interview lasted approximately 10 minutes and was recorded. During the interview, Saldana volunteered that he had purchased a 9mm firearm from Audelo. He claimed that he had given the gun to another individual to whom he owed money. He admitted that he knew that the guy holding the gun still had it. He offered to try and retrieve it. When Saldana was asked how he would get the gun back, he responded, "I'll probably see him around . . .."

9. Saldana was asked to call Detective Rivas when he retrieved the weapon. Detective Rivas gave Saldana a business card with the pager number of another detective he was to call once he retrieved the weapon. He said that he would try and get the gun by 3:00 p.m. and that he would be driving his mother's truck. At one point, detectives asked if they could pick up the gun at his mother's house. Saldana rejected that idea and he and the detectives agreed that they would pick another place to meet.

10. Toward the end of the interview, the detectives again pointed out the pager number Saldana should call and said, " . . . [T]here's the phone number, okay, so we, we

need to hear from you today." When Saldana responded, "okay," the detective asked "[S]o what time do you think you'll call?" Saldana then said, "I'll call you around quarter to three so we can make the trade around three, if I get it by three. If not, for sure by around 8."

11. He was not placed under arrest at either the conclusion of the search of his home or the interview at the police station. Saldana left the Hollenbeck Division police station at the conclusion of the interview without incident. He never attempted to contact Detective Rivas.

12. While the parties dispute whether Saldana was handcuffed during the search of his home and during the ride to the Hollenbeck station, the weight of the evidence establishes that Saldana was not handcuffed either during the search of his home or during the ride to the station. Detective Rivas testified that officers had patted Saldana down to make sure he had no weapons; that "the whole objective was to try to get his cooperation;" that the detectives needed Saldana's help finding the gun; and that the detectives wanted to "maintain a relationship with [Saldana]." Detective Eagleson testified that as a general rule, detectives do not handcuff an individual unless it is necessary to do so, or unless the individual is a suspect. Detective Eagleson added that if a person is cooperative and unarmed, detectives will normally just "sit him down" and watch him during a search. The detectives testified that it was their custom and practice in similar situations not to handcuff someone who was not a suspect, who had no outstanding warrants, had been patted-down, and was being watched by officers.

13. The audiotape also showed that Saldana was not frightened or intimidated during the interview. This was not Saldana first contact with the police. Although Saldana was never advised of his Miranda rights, he was familiar with Miranda rights as a result of prior contacts with the police. He also had prior contacts with the police that did not result arrests.

14. During questioning at the station, detectives did not threaten or suggest to Saldana that he would be placed under arrest or prosecuted, nor did they brandish their

weapons. He was never confronted with evidence of the Cerda or Wilson murders during questioning. Saldana was repeatedly advised that he was not under arrest, that the interview related to a murder committed by a rival gang member, and that he was free to leave.

15. At the time of the interview, the police had no evidence against Saldana or reason to suspect that he was involved in the Wilson or Cerda murders. There is no evidence that at any time the police intended to elicit any incriminating statements about any crime committed by Saldana. Saldana was not interrogated about the Wilson murder – the questions related solely to the whereabouts of the 9mm he received from Audelo. No pressure or coercive tactics were employed by the detectives either during the search or the subsequent interview.

16. The evidence that Saldana was handcuffed during the search and ride to the police station came from Saldana and his siblings. The testimony was neither compelling nor credible. In light of their demeanor and manner while testifying, their interest in the outcome of the hearing,[1] their relationship to the accused, the fact that other evidence contradicted their testimony,[2] and the reasonableness of the evidence in light of other evidence and common sense, the Court concludes that the claim that Saldana was handcuffed during the search of his home and ride to the Hollenbeck station was not credible.

17. On the other hand, the detectives' testimony was credible and consistent with other evidence. The questions posed by the detectives to Saldana were not "reasonably likely to elicit an incriminating response" and therefore their questions did not constitute an

---

[1] Saldana was facing a life sentence if convicted.

[2] At the pretrial hearing, Saldana's brother, Amado Saldana, testified that Saldana was handcuffed at the house. However, he also provided testimony at the hearing that directly contradicted statements he had provided under oath in his declaration. Specifically, Amado claimed in his declaration that he had seen the police place his brother in a police car while his brother was handcuffed. At the hearing, however, he admitted that he had not seen his brother after his brother left the house, and that he had not, in fact, seen the police put his brother into a car.

interrogation of Saldana, and under the circumstances did not at the time equate to compulsion, subtle or otherwise. Moreover, the detectives' testimony was consistent with and substantiated by the audio recording. Saldana's demeanor, as evidenced by the recording, displayed willingness to talk with the detectives.

18.  As a procedural safeguard to protect a person's Fifth Amendment rights, Miranda warnings must be given prior to a custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 444-45 (1966). These warnings require the individual to be informed "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires. . . " Miranda, 440 U.S. at 479.

19.  Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444. The objective test is whether a reasonable person in the defendant's position would not feel free to terminate the interrogation and leave. United States v. Craighead, 539 F.3d 1073, 1082 (9th Cir. 2008).

20.  In the custodial context, interrogation means "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

21.  An individual is in custody when he is formally arrested or when his freedom of action is deprived to "a degree associated with formal arrest." United States v. Rodriguez-Preciado, 399 F.3d 1118, 1127 (9th Cir. 2005).

22.  In determining whether an individual is in custody, the Court looks at all the circumstances surrounding the interrogation. See United States v. Kim, 292 F.3d 969, 973 (9th Cir. 2002). The relevant inquiry is how a reasonable man in the suspect's position would have understood his situation. And custody exists for Miranda purposes if a

reasonable person in that position would have felt he or she was not at liberty to terminate the interrogation and leave. The test is an objective one.

23. In considering the totality of the circumstances of the questioning, the Court considered the following factors, among others: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." Kim, 292 F.3d at 974 (citing United States v. Hayden, 260 F.3d 1062, 1066 (9th Cir. 2001). In this case, the initial questioning took place in Saldana's home in familiar surroundings, near his family, and away from public view. Saldana voluntarily accompanied Detective Rivas to the station for continued questioning. The language used by the detectives was non-confrontational and non-threatening. Moreover, the detectives' version of the events, including the duration or length of the interview and the absence of pressure applied to detain Saldana was corroborated by the audiotape.

24. Under the totality of the circumstances, the Court concludes that Saldana was not in custody, and a reasonable person in his position would have understood that he was speaking to the detectives voluntarily and that he was free to stop talking to the detectives and leave at any time. The Court finds that the defendant's statements were given freely, voluntarily, and deliberately without the threat of intimidation, deception, or coercion.

DATED: September 9, 2013

Percy Anderson
UNITED STATES DISTRICT JUDGE